Janet L. LONG, Plaintiff,

v.

MANGO'S TROPICAL CAFE, INC., and David Wallack, Defendants.

No. 96–2098–CIV.

United States District Court, S.D. Florida.

July 14, 1997.

Andres Rivera–Ortiz, Miami, FL, for Plaintiff.

Philippe Lieberman, Miami, FL, for Defendants.

*ORDER DENYING PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING DEFENDANTS' RENEWED CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT; DISMISSING CASE*

JAMES LAWRENCE KING, District Judge.

THIS CAUSE, arising out of a lawsuit alleging violations of the Employee Polygraph Protection Act of 1988 ("EPPA"), 29 U.S.C. §§ 2001–2009, comes before the Court upon a Second Motion For Partial Summary Judgment filed by Plaintiff, Janet L. Long, on May 5, 1997. (Docket Entry # 58.) Defendants, Mango's Tropical Cafe, Inc. ("Mango's"), and David Wallack, filed a Response in opposition on May 13, 1997. (D.E.# 69.) Plaintiff filed a Reply on May 20, 1997. (D.E.# 78.)

Additionally, Defendants filed a Renewed Cross–Motion For Partial Summary Judgment, on May 13, 1997. (D.E.# 69.) Plaintiff filed a Motion To Strike the Renewed Cross–Motion, on May 20, 1997. (D.E.# 77.) Defendants filed a Memorandum in Opposition to the Motion To Strike, on May 21, 1997. (D.E.# 80.)

On May 23, 1997, the Court heard oral argument on the above-mentioned Motions and extended the time in which the parties could conduct discovery.[1]

## I. FACTUAL BACKGROUND

The following facts, largely adopted from this Court's March 13, 1997 "Order Denying Defendant's[2] Motion For Summary Judgment; Denying Plaintiff's Cross–Motion For Partial Summary Judgment, [etc.]" (the "March 13th Order") (D.E.# 38), are both relevant to the instant Motions and uncontroverted. Defendant–Mango's, a bar on South Beach in Miami Beach, hired a company, Deception Control, Inc., to send an undercover agent, called a spotter, into Mango's to observe the bartenders and report on their conduct. On the night of June 10, 1996, the spotter, Anne Marie Suarez, conducted a surveillance and recorded her observations in a report[3] that included the following:

> The barmaid who identified herself as "KILLER"[4] was observed as she took multiple drink orders from several patrons without recording [sic] immediately after each service. On one occasion she was observed taking a $20 bill from a patron, folded the bill and placed it inside the band of her shorts. Immediately after, she took a drink order from another patron, prepared the drinks and took the money from this patron as well.

> As she walked to the northern register, she retrieved the $20 bill from her shorts band and rang up only one sale. The money from the second patron was thrown into the tip jar.

> As Killer returned change to another patron, the patron was observed as he handed her a $1 bill. Killer was not satisfied with the tip and held out her hand for the patron to give her more money. Finally the patron was overheard as he told her, "No!" and he moved from the area of the bar where he was sitting.

> At 11:50 p.m. when the agent ordered a second round of drinks, Killer prepared the drinks, placed them in front of the agents and retrieved a $20 bill from the

---

1. The Court held off on specifying dates on which discovery was to cut off and by which all motions were to be filed. That is because the dates depend on the date of the pretrial conference, which had not been set as of May 23, 1997. For that reason, the Court shall proceed to consider the above-mentioned summary judgment motions.

2. At the time of the Order, Mango's was the only Defendant.

3. The Report, on letterhead of Deception Control, Inc., contains observations about Plaintiff as well as three other bartenders working on the same shift on June 10, 1996. The observations about the other bartenders are not relevant to the instant Motions.

4. "Killer" is Plaintiff's nickname. (Long Dep. at 15) (D.E.# 16.)

agent. She made changed [sic] the $20 in the register, placed most of the money into her tip jar, and placed agents' change ($8.50) on the bar. Killer had not recorded this sale and the register window read "No Sale".

It is strongly believed that Killer was "high". She was observed on many occasions as she "wiped" her nose, kept licking her lips and wiping the corners of her mouth.

(Suarez Aff.Ex. A at 2–3) (D.E.# 72.)

Based on that report, Defendant–Mango's suspended Plaintiff from work and requested that she submit to a polygraph examination. Plaintiff took the polygraph examination in late June 1996.[5]

## II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court must view the evidence in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. If the movant meets this burden, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exits. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir.1993). If the evidence relied on is such that a reasonable jury could return a verdict in favor of the nonmoving party, then the Court should refuse to grant summary judgment. *Hairston,* 9 F.3d at 919. However, a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

5. The polygraph examiner, Al Gonzalez, states in an affidavit that the test results were "inconclusive," a result he attributes to Plaintiff's drug use before taking the test. (Gonzalez Aff. at 1–2) (D.E.# 32.) As to the drug use, Plaintiff admits

If the evidence is merely colorable or is not significantly probative, summary judgment is proper. *Id.* at 249–50, 106 S.Ct. at 2510–11.

## III. DISCUSSION

Since March 13, 1997, the date this Court ruled on the parties' first cross-motions for summary judgment, Defendants have filed a number of documents, including a deposition of Mango's owner, David Wallack, (D.E.# 47); an affidavit of Mr. Wallack, (D.E.# 72); a deposition of Anne Marie Suarez, a state-licensed private investigator who worked as the "spotter" in the investigation of Mango's, (D.E.# 72); a deposition of Tanya Moreno, a Mango's bartender, (D.E.# 74); and a deposition of Robert Berger, manager of a bar to which Plaintiff applied for employment, (D.E.# 72).

### A. The alleged disclosure violation

■ Plaintiff asks the Court to find, as a matter of law, that Defendant–Mango's violated the EPPA by "referring to and using the results of Plaintiff's polygraph test and by disclosing information obtained during Plaintiff's polygraph test." (Pl.'s 2d Mot. for Partial Summ.J. at 1.) Specifically, Plaintiff alleges a violation of the § 2008, titled "Disclosure of information," which states in its entirety:

(a) In general

A person, other than the examinee, may not disclose information obtained during a polygraph test, except as provided in this section.

(b) Permitted disclosures

A polygraph examiner may disclose information acquired from a polygraph test only to—

(1) the examinee or any other person specifically designated in writing by the examinee;

(2) the employer that requested the test; or

to using a small amount of cocaine and marijuana during the week before the test, and to smoking one joint of marijuana the day before the test. (Long Dep. at 40–41) (D.E.# 16.).

(3) any court, governmental agency, arbitrator, or mediator, in accordance with due process of law, pursuant to an order from a court of competent jurisdiction.

(c) Disclosure by employer

An employer ... for whom a polygraph test is conducted may disclose information from the test only to—

(1) a person in accordance with subsection (b) of this section; or

(2) a governmental agency, but only insofar as the disclosed information is an admission of criminal conduct.

29 U.S.C.A. § 2008 (West Supp.1997).

The violation occurred, Plaintiff alleges, when Mango's owner, David Wallack, informed Mango's employees at a staff meeting that Plaintiff had failed or not passed a polygraph exam. Mr. Wallack effectively admits as much. He testified in a deposition: "I probably said that she had filed a lawsuit, that she didn't pass the polygraph test, and that the examiner indicated that she was doing drugs right before the polygraph exam.... What's an employer to do in that situation?" (Wallack Dep. at 114.)

The Court does not read § 2008 as prohibiting Mr. Wallack from saying what he said, given the circumstances. Mr. Wallack's statement occurred on August 7, 1996, a week after Plaintiff filed the instant lawsuit in U.S. District Court, on July 31, 1996. The Complaint, a public document that alleges numerous EPPA violations against Mango's, implies that Plaintiff was fired based on her polygraph test results. It states, "Defendant violated ... the Act by disciplining, discriminating against, and discharging Plaintiff on the basis of a request to take and/or *on the basis of a polygraph test* without additional supporting evidence." (Pl.'s Compl. ¶ 10(f)) (emphasis added.) Nothing in the Act suggests that an employer must remain mute about an employee's polygraph test even after that employee has filed suit against the employer.

■ Further, the Court finds that no disclosure occurred. An employee at the meet-

ing, Tanya Moreno, testified that Mr. Wallack never mentioned Plaintiff by name. (Moreno Dep. at 40.) The only reason Ms. Moreno knew that Mr. Wallack was talking about Plaintiff was because Plaintiff had previously told Ms. Moreno what had happened. "[Plaintiff] told me that she got a bad spotter's report, that she was — that she took a polygraph and that she failed it, and then she told me that she smoked weed." (*Id.* at 44.) Mr. Wallack cannot be said to have disclosed Plaintiff's polygraph results. The statute's use of the word "disclose" does not mean merely "speak about." Rather "disclose" means "to make known: open up to general knowledge ...; *esp.:* to reveal in words (something that is secret or not generally known)". Webster's 3d New International Dictionary 645 (1986). Mr. Wallack cannot be said to have disclosed anything about Plaintiff's test results, given that her name may not have been mentioned and given the public filing of Plaintiff's original Complaint.

Finally, after Plaintiff stopped working at [6] Mango's and before she filed her lawsuit, Plaintiff applied for work at another bar, Moe's Cantina. Moe's manager, Robert Berger, testified that, when he called Mango's for a reference, he was told only, " 'Killer was let go from here.' " (Berger Dep. at 6.) He was not told anything about a polygraph test.

## B. "Reasonable suspicion" under the EPPA

■ Under the EPPA, an employer may ask an employee to take a polygraph examination, but the request must conform to certain guidelines. Section 2006(d), which sets out those guidelines, states in pertinent part:

Subject to sections 2007 and 2009 of this title, this chapter shall not prohibit an employer from requesting an employee to submit to a polygraph test if—

(1) the test is administered in connection with an ongoing investigation involving economic loss or injury to the employer's business, such as theft ...;

---

**6.** As to whether Plaintiff was fired or, rather, quit    working at Mango's, *see infra.*

(2) the employee had access to the property that is the subject of the investigation;

(3) the employer has a *reasonable suspicion* that the employee was involved in the incident or activity under investigation;

(4) and the employer executes a statement, provided to the examiner before the test that—

(A) sets forth with particularity the specific incident or activity being investigated and the basis for testing particular employees,

(B) is signed by a person (other than a polygraph examiner) authorized to legally bind the employer,

(C) is retained by the employer for at least 3 years, and

(D) contains at a minimum—

(i) an identification of the specific economic loss or injury to the business of the employer,

(ii) a statement indicating that the employee had access to the property that is the subject of the investigation, and

(iii) a statement describing the basis of the employer's reasonable suspicion that the employee was involved in the incident or activity under investigation.

29 U.S.C.A. § 2006(d) (West Supp.1997) (emphasis added).

Based on these new filings, in conjunction with the filings submitted prior to the March 13th Order,[7] the Court finds that Defendant had reasonable suspicion to believe that Plaintiff was "involved in the incident or activity under investigation." 29 U.S.C.A. § 2006(d) (West Supp.1997).[8]

The Court, considering the totality of the circumstances, bases its finding on the following facts. In June 1996, Mango's "pour cost"[9]—a comparison of weekly inventory to weekly sales—was not within acceptable limits, an indication that thefts were occurring at Mango's. (Wallack Aff. at 1.) For that reason, Mango's hired the investigative firm of Deception Control, Inc., to send undercover agents, called "spotters," to the bar. (*Id.* at 1–2.) The firm sent Ms. Suarez, who

---

**7.** In particular, the Court refers to two pieces of evidence. First, Plaintiff admitted that her actions as recorded in the Spotter's Report "might appear that way," (Long Dep. at 23), meaning that her actions might appear as if she were stealing. Second, she signed a "Release To Take Polygraph Test," which states,

> I FURTHER AGREE THAT THE COMPANY HAS REASONABLE SUSPICION TO REQUEST THAT I SUBMIT TO A POLYGRAPH EXAMINATION AND I'M COMPLETELY SATISFIED WITH THE EXPLANATION GIVEN TO ME IN WRITING IN THE "48 HOURS TO TAKE A POLYGRAPH TEST" FORM BY THE COMPANY.

(Def.'s Notice of Filing Dep. and Exs. Ex. 3 at 4) (D.E.# 16.) Although the Court's March 13th Order states that Plaintiff's signing the Release did not in and of itself confer on Mango's the reasonable suspicion necessary to request that Plaintiff take a polygraph, the Order also states that Defendant was not foreclosed from proving reasonable suspicion as a matter of law. (March 13th Order at 9–10.) The Court now finds that Defendant's evidence rises to the level necessary to show that reasonable suspicion existed as a matter of law.

**8.** The EPPA does not define "reasonable suspicion." The interpretive regulations promulgated by the Department of Labor, however, state:

> [T]he term "reasonable suspicion" refers to an observable, articulable basis in fact which indicates that a particular employee was involved in, or responsible for, an economic loss.... Information from a co-worker, or an employee's behavior, demeanor, or conduct may be factors in the basis for reasonable suspicion. Likewise inconsistencies between facts, claims, or statements that surface during an investigation can serve as a sufficient basis for reasonable suspicion. While access or opportunity, standing alone, does not constitute a basis for reasonable suspicion, the totality of the circumstances surrounding the access or opportunity (such as its unauthorized or unusual nature or the fact that access was limited to a single individual) may constitute a factor in determining whether there is a reasonable suspicion.

29 C.F.R. § 801.12(f)(1) (1996).

**9.** The pour cost for a week is calculated as follows. Add beginning inventory and purchases for the week, then subtract ending inventory to get cost of sales. Cost of sales is then divided by sales for the week to get pour cost. (Def.'s Mem in Opp'n to Pl.'s 2d Mot. for Partial Summ.J. at 2–3.)

specializes in such work. (Suarez Aff. at 4.) Ms. Suarez never spoke with anyone at Mango's before performing her surveillance; nor was she told by her bosses to look out for any particular individual at Mango's. (*Id.* at 8–9.)

Ms. Suarez wrote up a report from her surveillance of Mango's on the night of June 10, 1996. The report accurately reflects Ms. Suarez's notes, from which the report was written. (*See id.* Ex. B.) Ms. Suarez's deposition testimony also buttresses her conclusion that Plaintiff was high.[10] When asked what led her to believe that Plaintiff was high, Ms. Suarez stated: "I believe in the way she spoke, she was very animated in the way she spoke and in her actions. I observed her wipe her nose several times and her nose was not wet. I saw her lick her lips and wipe the corners of her mouth." (*Id.* at 20 & 50.) Contrary to Plaintiff's explanation for her behavior, (*see* Long Aff. ¶ 3) (D.E.# 21), Ms. Suarez said Plaintiff did not appear to be sweating profusely. (Suarez Aff. at 20.)[11] She also testified that, though she is aware that the use of tip jars and the ringing up of "No Sales" are common practice in the bar business, Plaintiff did not ring up the sale of drinks bought by Ms. Suarez. (Suarez Dep. at 24 & 31.)[12]

In conclusion, the Court finds that Defendant–Mango's had reasonable suspicion to request that Plaintiff submit to a polygraph examination, and Defendant–Mango's met all other applicable requirements of § 2006(d).

## C. Other alleged EPPA violations

Although the Defendant's alleged violation of § 2006 goes to the heart of Plaintiff's case,

she also alleges violations of other sections of the EPPA, which the Court addresses in numerical order.

### 1. Sections 2002(1) & (3)

■ Section 2002 states in relevant part:

*Except as provided in sections 2006* and 2007 of this title, it shall be unlawful for any employer engaged in or affecting commerce or in the production of goods for commerce—

(1) directly or indirectly, to require, request, suggest, or cause any employee or prospective employee to take or submit to any lie detector test.

.    .    .    .    .

(3) to discharge, discipline, discriminate against in any manner, or deny employment or promotion to, or threaten to taken any such action against—

(A) any employee or prospective employee who refuses, declines, or fails to take or submit to any lie detector test, or

(B) any employee or prospective employee on the basis of the results of any lie detector test.

29 U.S.C.A. § 2002(1) & (3) (West Supp.1997) (emphasis added).

The Court finds that its decision that Defendant's conduct complied with the requirements of § 2006 renders moot Plaintiff's claims under §§ 2002(1) and (3).

---

**10.** As the Court stated in its March 13th Order, such an observation constitutes the kind of "behavior, demeanor, or conduct" evidence contemplated in the Regulations. *See* § 801.12(f)(1) (1996), quoted in context *supra* note 8.

**11.** Although Plaintiff denies being high on the night of June 10, 1997, the investigator's observations seem highly credible in light of Plaintiff's admission that she smoked marijuana on the day before taking the polygraph test and that she had used marijuana and cocaine several days before the test. (Long Dep. at 40–42.)

**12.** In its March 13th Order, the Court stated:
Although the Court agrees that Plaintiff's actions may have looked like stealing to a spotter

(in fact, they did look like stealing to the spotter whom Defendant hired), the analysis does not end there. For it is not the spotter who must have reasonable suspicion of illegal activity, but rather the employer-Defendant. Here, Defendant presents no evidence that the spotter knew about the rules and procedures—specifically those regarding the ringing up of "No Sales" and the use of the tip jar—under which Plaintiff and the other bartenders worked.
(March 13th Order at 13–14.) The totality of the evidence now before the Court convinces the Court that the employer-Defendant had the reasonable suspicion required by the EPPA to request that Plaintiff submit to a polygraph.

### 2. Sections 2007(b)(2)(A)

Section 2007, titled "Restrictions on use of exemptions," states in relevant part:

(b) Rights of examinee

The exemptions provided under subsection[ ] (d) . . . of section 2006 of this title shall not apply unless the requirements described in the following paragraphs are met:

.     .     .     .     .

(2) Pretest phase

During the pretest phase, the prospective examinee—

(A) is provided with reasonable written notice of the date, time, and location of the test, of such examinee's right to obtain and consult with legal counsel or an employee representative before each phase of the test;

29 U.S.C.A. § 2007(b)(2) (West Supp.1997).

■ The Court rejected the claims alleging violations of § 2007(b)(2)(A) in its March 13th Order. (*See* March 13th Order at 17–20.) The Court herein incorporates the findings of the March 13th Order. No material facts are in dispute and, as a matter of law, Plaintiff received "reasonable written notice" of the test and of her right to consult with legal counsel.

### 3. Sections 2007(b)(4)(A) & 2007(b)(4)(B)(i)-(ii)

Section 2007(b)(4) states:

(4) Post-test phase

Before any adverse employment action, the employer shall—

(a) further interview the examinee on the basis of the results of the test; and

(B) provide the examinee with—

(i) a written copy of any opinion or conclusion rendered as a result of the test, and

(ii) a copy of the questions asked during the test along with the corresponding charged responses.

29 U.S.C.A. § 2007(b)(4) (West Supp.1997). The Court finds that Plaintiff was placed on suspension *before* she took the test on June 27, 1996, and that Mango's took no further action *after* the test. Plaintiff's own testimony supports this finding. She states in her deposition that she took the polygraph during the afternoon and waited until 8 p.m. to hear from Mango's about the results. (Long Dep. at 60.) No one called, so she went to Kinko's, a copy shop, to make copies of her resume. She states:

"When I got home from Kinko's that night there was a message from Susan [Eidelman, a Mango's manager,] saying that I was still suspended until I could have a meeting with David [Wallack, Mango's owner] and David would be out of town until Sunday. This was on Friday."

(*Id.* at 62.) Except for an inconsequential telephone exchange with Mr. Wallack,[13] Plaintiff never spoke with anyone from Mango's after receiving that message. (Long Dep. at 61.) On her own initiative during the first week of July 1996, she started looking for a new job; she landed a new job, which she started on July 5, 1996. (Long Dep. at 69.) The Court concludes that no adverse employment action occurred after Plaintiff took the polygraph. And because no adverse employment action occurred after she took the test, there was nothing to trigger the provisions of subsections (b)(4)(A) and (B).

### 4. Section 2007(b)(5)

Section 2007(b)(5) states in relevant part, "The examiner shall not: . . . conduct any such test for less than a 90–minute duration." 29 U.S.C.A. § 2007(b)(5) (West Supp.1997).

Plaintiff alleges, without providing evidentiary support, that the test lasted less than ninety minutes. Plaintiff's allegation, however, is contradicted by her own words. Attached to the affidavit of Al Gonzalez, the security manager and chief polygraph examiner of Feick Security, is a one-page document titled "Examine [sic] Check Off List," which Plaintiff signed and dated after taking the polygraph. (Gonzalez Aff. Ex. B at 8) (D.E.# 11.) The first item, designated item

---

**13.** Plaintiff stated that sometime within the next couple of weeks Mr. Wallack called her while she was sleeping. She answered the phone and said, "Call me back." (Long Dep. at 65.)

(a), states: "I agree that the test took at least *90 minutes* in duration from the time I entered the examiners [sic] office until the time I left the examiners [sic] office. Time *1:00 PM* to *2:30 PM* Date *6/27/96.*" Plaintiff signed and dated this item.[14]

The Court finds that no genuine dispute over material fact exists as to the duration of the polygraph exam, and that the exam lasted the required length of time.

## IV. PENDENT CLAIMS

Pursuant to the Court's March 13th Order, Plaintiff filed an Amended Complaint on March 19, 1997, in which she alleges a state-law claim of slander against Mango's and its owner, David Wallack. Because the Court by this Order dismisses the federal-law claims on which jurisdiction for this case depends, the pendent state-law claims may be, and hereby are, dismissed pursuant to 28 U.S.C. § 1367(c)(3). Therefore, Count II of the Amended Complaint is dismissed with prejudice as to its being refiled in federal court; it is dismissed without prejudice as to its being refiled in an appropriate state court.

## V. CONCLUSION

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Plaintiff's Second Motion For Partial Summary Judgment be and is hereby DENIED.

It is FURTHER ORDERED and AD-JUDGED that Defendants' Renewed Cross-Motion For Partial Summary Judgment be and is hereby GRANTED. Plaintiff's federal-law claims under the EPPA are DIS-MISSED.

It is FURTHER ORDERED and AD-JUDGED that Plaintiff's state-law slander claim be and is hereby DISMISSED without

prejudice to refile in an appropriate State court.

---

14. At item (a), Plaintiff wrote down the date as 6/26/96. She also signed her name and wrote down the date of 6/26/96 on items (b)—(e). On the last item, however, item (f), which states "I *(Did) (Did Not)* request copies of the Polygraph test results from the examiner after my interview and test was [sic] conducted," Plaintiff signed her name, and entered the date as 6/27/96. (Although the "(Did Not)" is circled, she denies circling it. (Long Dep. at 76–77).) Mr. Gonzalez states in his affidavit that the test was conducted on June 27, 1996. The Court declines to speculate as to why Plaintiff wrote down two different dates on the same page.